UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ATC HEALTHCARE SERVICES, INC.,

               Plaintiff,

    - against -

PERSONNEL SOLUTIONS, INC., et al.,

               Defendants.
-------------------------------------------------------X

**R E P O R T   A N D**
**RECOMMENDATION**

01 CV 762 (CBA)

On February 9, 2001, plaintiff ATC Healthcare Services, Inc. ("ATC"), a franchisor of

businesses that provide temporary personnel services to the health care community, commenced

this action against defendants Personnel Solutions, Inc., a former franchisee of ATC

("Personnel"), Debra Demers,[1] president of Personnel ("Demers-Witt"), and Memphis

Healthcare[2] ("Memphis Medical"), seeking injunctive relief and damages for, among other

things, trademark infringement, unfair competition, breach of contract, and misappropriation of

trade secrets. In the Complaint, plaintiff alleges that following the termination of its franchise

agreement with Personnel, Demers-Witt improperly continued servicing ATC clients through

Memphis, an unincorporated entity.

On September 16, 2004, the district court ordered that a default judgment enter against

---

    [1]According to a letter submitted to the Court dated September 5, 2003, Debra Demers is
now remarried and using the name Demers-Witt.

    [2]As noted in the district court's March 14, 2003 Order, while ATC originally named
Memphis Healthcare as the medical staffing business owned and operated by Demers-Witt,
Demers-Witt's new business was actually called "Memphis Medical Staffing, Inc."

defendants based on their failure to file an answer and to participate in the discovery process.[3] The case was then referred to the undersigned to conduct an inquest and issue a Report and Recommendation on damages.

## FACTUAL BACKGROUND

The plaintiff alleges that ATC has developed a system for operating, developing, and franchising businesses that provide temporary personnel services to the health care community. (Savitsky Decl. ¶ 3).[4] ATC has generated a variety of manuals and training and operations materials that reflect the system it has developed, and has obtained certain trademarks, service marks, copyrights, and logotypes. (Id. ¶¶ 3-4). Among others, ATC's mark and design are registered with the Patent and Trademark Office. (Id. ¶ 4).

On April 3, 1997, ATC awarded a franchise agreement (the "Agreement") to Unlimited Healthcare, L.L.C. ("Unlimited") for a term of ten years, expiring on April 2, 2007. (Id. ¶ 5; Ex. A). Pursuant to the Agreement, Unlimited was authorized, subject to certain restrictions, to operate a franchised ATC business and to sell temporary and permanent medical personnel services. (Id. ¶ 5). Under the Agreement, ATC was to perform all billing, collection, and

---

[3]As detailed in the district court's September 16, 2004 Order, a default judgment had initially been entered against defendants on January 9, 2002, when defendants failed to answer or otherwise respond to the Complaint. That default judgment was subsequently vacated when Ms. Demers-Witt appeared in the action and sought to vacate the default. The default was, however, subsequently reinstated on September 16, 2004 following defendants' continued failure to answer and participate in discovery.

[4]Citations to "Savitsky Decl." refer to the Declaration of David Savitsky, Chief Executive Officer of ATC, submitted in support of ATC's calculation of damages and dated August 22, 2005.

temporary employee payroll functions for the franchisee. (Id. ¶ 10). After collecting the amounts due from clients, ATC was to pay the temporary employees directly and remit royalties to the franchisee. (Id.)

Additionally, the Agreement allowed Unlimited to use ATC's system and materials in specified locations in Tennessee. (Id. ¶ 5). These materials included a confidential operating manual (the "Manual"), and various training materials that contained techniques related to recruiting and retaining referrals for internal office staff and temporary personnel and information on bids and proposals to clients, advertising, billing rates, and cross-selling techniques. (Id. ¶ 8). Plaintiff asserts that these documents contain confidential and proprietary trade secrets that are not available other than through ATC's records or from its agents and employees. (Id. ¶ 9). For this reason, Section XV of the Agreement provides that the franchisee shall not engage in any business competitive with that of a franchised ATC business for one year after the termination of the Agreement. (Id.; Ex. A).

The Agreement also authorizes the franchisee to use ATC's customers and employees in operating the business at the inception of the franchise period. (Id. ¶ 7). This proprietary information, including the identity of ATC's customers with a proven propensity to use these types of services and the identity of employees with an established ability to staff the health care needs of customers, was not generally known and was only available through access to ATC's records, thereby giving the ATC franchisee a distinct competitive advantage. (Id.) Thus, the Agreement contains a provision requiring the franchisee not to divulge confidential information. (Id.; Ex. A § 8.01).

Defendant Demers-Witt, the president of Personnel, purchased the business from

Unlimited. (Id. ¶ 5). Effective September 24, 1999, Demers-Witt and Personnel began operation under ATC Healthcare, "Branch Office Memphis 46." (Id. ¶ 6). According to plaintiff, defendants never signed the Agreement even though they operated through ATC and accepted royalty payments through January 3, 2001. (Id.) Plaintiff alleges not only that Demers-Witt was given access to the clients and employees of ATC (id. ¶ 7), as well as access to the Manual and various operating and training materials (id. ¶ 8), but also that she was permitted to use the ATC Quick Pay Program, under which payroll could be advanced to temporary employees for their services. (Id. ¶ 11). Plaintiff alleges that although the Quick Pay Program checks were to be used for payroll advances only, Demers-Witt issued handwritten, unauthorized checks from the ATC account for other purposes, in an amount totalling over $24,661.00. (Id.)

Effective January 3, 2001, plaintiff terminated the Agreement due to defendants' failure to comply with the terms of the Agreement. (Id. ¶¶ 12, 22). Despite the termination and the non-compete clause, Ms. Demers-Witt continued to operate a similar business under the name "Memphis Medical Staffing, Inc." from the same location where Demers-Witt had previously operated her ATC franchise. (Id. ¶¶ 12, 14). She continued to serve ATC clients and use ATC employees.

Plaintiff brought suit to recover amounts wrongfully issued under the Quick Pay Program, back royalties that were advanced to defendants and which the Agreement required them to repay, the anticipated revenue stream lost as a result of the unexpired term of the Agreement, and attorneys' fees and costs.

## PROCEDURAL HISTORY

Following service of the Complaint, defendants failed to answer, and on April 20, 2001, the district court entered a default judgment against defendants. The matter was then referred to the undersigned to conduct an inquest. Defendants moved to set aside the default and, after oral argument, the court granted their motion on November 30, 2001.[5] At that time, defendants were given until February 1, 2002 to file an answer.

Defendants never filed an answer. Instead, on June 27, 2002, defendants filed a motion to dismiss the case, asserting that the court lacked jurisdiction and that venue was improper. That motion was denied on March 13, 2003.

On May 2, 2003, counsel for defendants, Ira M. Thomas, Esq., moved to withdraw from further representation of defendants. That motion was granted after defendants failed to respond to a district court Order allowing Demers-Witt to object to counsel's motion.

Thereafter, defendants continued to fail to file an answer, and failed to appear for the August 7, 2003 conference set by this Court. Accordingly, this Court recommended that the default be reinstated. In a letter dated October 27, 2003, Ms. Demers-Witt responded to the Court's recommendation for reinstatement of the default. (Demers-Witt Letter dated Oct. 27, 2003). In the letter, Demers-Witt did not indicate an interest in defending the litigation, nor did she present any reasons why defendants should prevail on the merits. (Id.) Instead, she indicated

---

[5]While a calendar entry indicates that the defendants' motion was granted on November 30, 2001, the formal Order memorializing the decision was entered on January 9, 2002. In that Order, the district court also enjoined defendants from: (1) soliciting or contacting ATC's clients and customers; (2) misappropriating, infringing, converting, or using ATC's trademarks; (3) using their relationship or affiliation with ATC in any way; and (4) communicating, divulging, or using any of ATC's trade secrets.

5

that she was a former franchise holder of ATC, essentially admitting one of the allegations of plaintiff's Complaint. (Id.) She also stated that she closed down the franchise and started her own business because she never made any money. (Id.) This representation is also consistent, in part, with plaintiff's claims. In seeking to have the Court release her from the lawsuit, Ms. Demers-Witt explained that she was no longer employed and was "barely making ends meet." (Id.)

On September 21, 2004, the default was reinstated by the Clerk of Court, and the case was again referred to the undersigned to conduct an inquest and issue a Report and Recommendation as to damages.


## DISCUSSION

A. Default Judgment - Standards

Rule 55 of the Federal Rules of Civil Procedure sets forth a two-step process in which first a default, and then a default judgment, is entered. See Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993). The court clerk automatically enters the default pursuant to Rule 55(a) of the Federal Rules of Civil Procedure by noting the party's default on the clerk's record of the case. See id.; Fed. R. Civ. P. 55(a) (providing that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default").

After a default has been entered against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), a default judgment may be entered. See

Fed. R. Civ. P. 55(b). If the amount of damages must be ascertained in order for default judgment to be entered, the court may conduct a hearing. See Fed. R. Civ. P. 55(b)(2); Enron Oil Corp. v. Diakuhara, 10 F.3d at 95. Here, as detailed in the Court's discussion of the complicated procedural history of the case, the district court ordered the default judgment against defendants reinstated on September 16, 2004.

When a default judgment is entered, the defendant is deemed to have admitted all of the well-pleaded factual allegations in the complaint pertaining to liability. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080 (1993). For the purposes of an inquest, a court accepts as true all factual allegations in the complaint, except those claims relating to damages. Id.; Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

In determining whether a default judgment should enter, courts have cautioned that a default judgment is an extreme remedy that should only be granted as a last resort. See Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981). While the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] . . . delay and clog its calendar," it has noted that the district court must balance the interest in expediting cases with the court's responsibility to "afford[ ] litigants a reasonable chance to be heard." Enron Oil Corp. v. Diakuhara, 10 F.3d at 95-96. Thus, in light of the "oft-stated preference for resolving disputes on the merits," defaults are "generally disfavored" and any doubts should be resolved in favor of the defaulting party. Id. Accordingly, the plaintiff is not entitled to a default judgment as a matter of right, simply because the defendant is in default. See Erwin DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (stating that

courts are required to "supervise default judgments with extreme care to avoid miscarriages of justice").

The court possesses significant discretion, and may consider a number of factors in deciding whether to grant a default judgment, including whether the grounds for default are clearly established and the amount of money potentially involved. See Hirsch v. Innovation Int'l, Inc., No. 91 CV 4130, 1992 WL 316143, at *2 (S.D.N.Y. Oct. 19, 1992). The greater the amount of money involved, the less justification there is for entering the default judgment. Id. Additionally, a court may consider whether material issues of fact remain, whether the facts alleged in the complaint state a valid cause of action, whether plaintiff has been substantially prejudiced by the delay involved, and how harsh an effect a default judgment might have on the defendant. See Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 10A Fed. Practice & Procedure, §§ 2685, 2688 (3d ed. 1998).

1) Applicability of the Franchise Agreement[6]

In this action, plaintiff has alleged that defendants breached the Franchise Agreement by failing to comply with certain terms of the Agreement and by subsequently operating a competing business in violation of the non-compete clause. Although plaintiff concedes that defendants never signed the Agreement (Savitsky Decl. ¶ 6), plaintiff, in seeking an assessment

---

[6]The Court notes that defendants raised this issue in various papers filed in connection with their motion to vacate the first default entered against them. (See, e.g., Affidavit of Ira M. Thomas in Support of Defendants' Motion to Set Aside Entry of Default, dated May 18, 2001 ("Thomas Aff."), ¶¶ 12, 14, 17; Affidavit of Debra Demers-Witt in Support of Defendants' Motion to Set Aside Entry of Default, dated June 14, 2001 ("Demers-Witt Aff."), ¶¶ 4, 6, 12). In light of that fact, the Court briefly addresses the issue, but notes that defendants, by defaulting in the case for a second time, have essentially conceded that they were subject to the Agreement.

of damages for lost future royalties for the remaining duration of ATC's original agreement with Unlimited, contends that defendants are nonetheless bound by the terms of the Agreement because Unlimited validly effectuated an assignment of the Agreement to the defendants. (Id. ¶ 22).

The Agreement originally executed between Unlimited and ATC contains a specific provision that prohibits any assignment by a franchisee "without the prior written consent of the Franchisor procured in accordance with the terms and conditions" of the Agreement "and/or without first complying with [the provision] pertaining to Franchisor's right of first refusal." (Id., Ex. A § 16.02).[7] Additionally, the Agreement dictates that among the "conditions precedent" to the franchisor's consent is a requirement that the assignee "shall have executed a separate Franchise Agreement in the form and on the terms and conditions then being offered by Franchisor to prospective franchisees." (Id., Ex. A §16.04).

Here, although defendants clearly did not execute a separate Franchise Agreement, plaintiff takes the position that there was a valid assignment, noting that Demers-Witt "began operating business pursuant to the provisions of the Franchise Agreement with ATC's consent after she bought the business" (id. ¶ 5), and that ATC "granted the request for transfer" in September 1999. (Id. ¶ 6).

Under New York law,[8] "[i]t is well established that a party to a contract may waive a

_____

[7]The provision further provides that "[a]ny actual or attempted assignment . . . made or accomplished in violation of the terms of [these provisions] shall be null and void and shall constitute an incurable breach of this Agreement by Franchisee, and this Agreement shall automatically terminate without further notice." (Id.)

[8]Although plaintiff has not addressed the question of which law applies, the Court has applied New York law in analyzing whether defendants assumed Unlimited's contractual

9

contract provision that is for its benefit." Central Park Elects., Inc. v. Hyundai Elects. America, No. 95 CV 4201, 1996 WL 537660, at *2 (S.D.N.Y. Sept. 20, 1996) (gathering cases); see also Tucek v. Hoffman, 161 A.D.2d 588, 589, 555 N.Y.S.2d 167, 168 (2d Dep't 1990); East Side Garage, Inc. v. New Brunswick Fire Ins. Co., 198 A.D. 408, 412, 190 N.Y.S. 634 (3d Dep't 1921). Moreover, the "[w]aiver of a contract [provision] may be either express or implied." Central Park Elects., Inc. v. Hyundai Elects. America, 1996 WL 537660, at *3 (noting that defendant "clearly and unambiguously indicated its intention" to waive a provision that mandated that it countersign an agreement with plaintiff in order for the agreement to become effective when it sold merchandise to plaintiff as if the agreement was in effect). As the provision requiring defendants to sign a new Franchise Agreement was intended to enure to ATC's benefit, plaintiff may waive the requirement by providing written consent to the assignment without obtaining fulfillment of the precondition. Indeed, this is precisely what plaintiff did: "ATC by letter granted the request for transfer" although "[d]efendants never signed the Franchise Agreement." (Savitsky Decl. ¶ 6).

At the same time, however, even though an assignee accepts the assignment of a bilateral contract, New York law does not automatically infer that the assignee has also agreed to assume the duties of the assignor, unless there are circumstances that suggest the assignee intended to assume such responsibilities. See Kaufman v. William Iselin & Co., Inc., 272 A.D.2d 578, 581-82, 74 N.Y.S.2d 23, 26 (1st Dep't 1947) (holding that "'no promise of the assignee to assume the

---

obligations. Although the assignment was likely effectuated in Tennessee, and ATC is a Delaware corporation with corporate offices in New York, the Agreement mandates the application of New York law and New York law appears to be, if anything, more demanding than the contractual principles applied in the other states.

assignor's duties is to be inferred from the acceptance of an assignment of a bilateral contract, in the absence of circumstances surrounding the assignment itself which indicate a contrary intention'") (quoting Langel v. Betz, 250 N.Y. 159, 163, 164 N.E. 890, 892 (1928) (holding that an assumption of contractual duties did not occur where the circumstances involved a "mere assignment of an invoice and of the merchandise covered thereby for purposes of securing a loan made by a commercial banker," as it was "not a situation in which it may be said that it was the intention of the parties that the factor should assume performance of the basic contract")); see also BSI-Banca Della Svizzera Italiana v. Ensra Constr. Corp., 194 A.D.2d 403, 403-04, 598 N.Y.S.2d 515, 516 (1st Dep't 1993). This notion runs counter to the principles set forth in the Restatement of the Law of Contracts, which generally holds that acceptance of an assignment by the assignee is interpreted as an acceptance of both the assignor's rights and duties, unless there is a showing of a contrary intent. See Kaufman v. William Iselin & Co., Inc., 272 A.D. at 581, 74 N.Y.S.2d at 25-26 (discussing Restatement of the Law of Contracts §164, subd. [2]). Thus, in this regard, New York law requires a greater showing than that generally required in other jurisdictions in order to demonstrate that the assignee agreed to assume the assignor's obligations under a contract.

In this case, the Court concludes that plaintiff has satisfied its burden to show both that Unlimited assigned its rights under the Agreement to defendants and that defendants assumed Unlimited's obligations under the Agreement. Even in the absence of contractual documentation indicating an express assumption, there is sufficient evidence in the record demonstrating plaintiff's acceptance not only of the rights awarded Unlimited under the Agreement, but also its obligations. There is clearly nothing to indicate that defendants did not understand, or did not

11

intend to accept, the assignment in full.

Specifically, in a letter dated November 11, 1999, Unlimited's Chairman indicated that Demers-Witt "paid [them] for the franchise" and that from Unlimited's viewpoint, Demers-Witt owned the franchise on that date as she was "operating the business, billing for services and paying the bills and holding out to the public as ATC." (Pl.'s Mem., Ex. E).[9] Furthermore, by letter dated June 15, 2000, defendant Demers-Witt indicated to ATC's Executive Vice President that defendants had purchased Unlimited's assets, paid ATC for the right to be a franchise owner, and operated its franchise under the royalty system which, by its very nature, implies an obligation to forward a share of one's profit to another individual. (Teixeira Aff., Ex. A).[10] Additionally, according to plaintiff, defendants "operated through and accepted royalty payments from ATC through January 3, 2001" (Savitsky Decl. ¶ 6), and "operated business under the guidelines of the Franchise Agreement." (Id. ¶ 11).

Perhaps most important, Ms. Demers-Witt admitted in a letter to the Court that she "use[d] to be a franchise owner with [ATC]" (Demers-Witt Letter dated Oct. 27, 2003), essentially conceding the point. Thus, while defendants, in seeking to set aside the entry of default in May and June 2001, challenged the enforceability of the Agreement in the absence of defendant Demers-Witt's signature, by defaulting, they have now waived that defense and are considered to have conceded the allegations in plaintiff's complaint. In this manner, an examination of the circumstances indicates that defendants assumed Unlimited's contractual

---

[9]Citations to "Pl.'s Mem." refer to plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Vacate Default Judgment, dated August 29, 2001.

[10]Citations to "Teixeira Aff." refer to the Affidavit of Ed Teixeira, dated August 28, 2001 and submitted in opposition to defendants' motion to set aside the default judgment.

duties when the valid assignment was effectuated.

In summary, the Court notes that in the context of a default judgment, plaintiff's assertion of a valid assignment generally goes unchallenged. If Ms. Demers-Witt wished to contest the validity of the assignment, it was her duty to do so by responding to the Complaint, which she neglected to do on two separate occasions. As a consequence, the Court finds that under the applicable law, defendants are bound by the terms of the Agreement executed between ATC and Unlimited by virtue of a valid assignment.

### 2) Breach of the Franchise Agreement

Having determined that defendants were bound to the terms of the Agreement, the Complaint clearly sets forth facts establishing a breach of contract claim. First, plaintiff alleges that defendants misused the ATC Quick Pay Program by issuing checks from the ATC account for purposes other than payroll. According to plaintiff, at the time of the termination of the Agreement, defendants owed ATC $24,661.00 in checks that were wrongfully issued under this Quick Pay Program. (Id. ¶ 20). Plaintiff further asserts that defendants owed $17,797.00 for "back royalties over advanced or 'negative royalties,'" which the Agreement required defendants to pay to ATC. (Id.) Plaintiff ultimately terminated the Agreement when defendants failed to pay these sums in accordance with the Agreement. (Id. ¶¶ 12, 20).

Furthermore, the Complaint alleges that defendants violated certain "non-compete" provisions in the Agreement. Specifically, the non-compete provisions prohibited the franchisee from "either directly or indirectly" engaging in a business that offered the same type of services as ATC. (Savitsky Decl. ¶¶ 12, 13, 15; Ex. A §§ 15.01, 15.02 ). These non-compete covenants

covered the time period during which the franchisee was operating ATC and continued for a period of one year immediately following the termination of the Agreement. (Id. ¶ 15, Ex. A §§ 15.01, 15.02).[11] Notably, the post-term non-compete covenant applied regardless of the reason for termination of the Agreement. (Id., Ex. A § 15.02). Plaintiff alleges that after receiving royalty benefits from ATC for six months, defendants breached these non-compete provisions of the Agreement when they began operating Memphis Medical, a competing business, at the same location at which the ATC franchise business operated. (Id. ¶¶ 12, 17). Since defendants have defaulted, these allegations are deemed to be true. Moreover, defendant Demer-Witts essentially admitted the truth of these allegations in her October 27, 2003 letter, where she explained that she opened a competing business when she realized she was not making any money through the ATC franchise.

Plaintiff also claims that defendants breached another provision of the Agreement that required defendants, upon termination of the Agreement "for any reason," to "[i]mmediately pay all sums due and owing" to ATC. (Id. ¶ 18; Ex. A § 18.02(1)). Section 18.02(5) of the Agreement further provides that where the franchisee is responsible for the termination due to a default, the franchisee must pay "all expenses incurred by Franchisor as a result of the default, including all damages, costs, and expenses, including reasonable attorneys' and experts' fees." (Id. ¶ 19; Ex. A § 18.02(5)).

---

[11]The Court notes that the post-term non-compete covenant contains a geographic limitation; the franchisee is not allowed to engage in a business offering the same type of services within its own territory or within a 100 mile radius from its territory or "any other ATC affiliate or other franchised territory." (Id., Ex. A § 15.02). Here, defendants opened their competing business in the same location at which they previously operated as an ATC franchisee (id. ¶ 12), an action clearly violative of the Agreement's non-compete clause.

14

Based on the allegations set forth in the Complaint, which are deemed to be true for purposes of this inquest, the Court concludes that defendants breached the Agreement, and that an award of damages is therefore appropriate.

Moreover, it is beyond dispute that defendants are in default. The corporate defendants, Personnel and Memphis Medical, are not only in default because they have not filed an answer to the Complaint, see Hirsch v. Innovation Int'l, Inc., 1992 WL 316143, at *2 (holding that "[the defendant's] default is crystal clear – it does not even oppose this motion"), but also because they have failed to obtain counsel since their previous counsel was terminated in May 2003. Failure to obtain counsel constitutes a failure to defend because corporations cannot proceed in federal court pro se. See Shapiro, Bernstein & Co. v. Continental Record Co., 386 F.2d 426, 427 (2d Cir. 1967) (per curiam) (stating that "it is settled law that a corporation cannot appear other than by its attorney"); see also Jones v. Niagara Frontier Transp. Auth., 722 F.2d 20, 22 (2d Cir. 1983) (discussing the rationale for requiring corporations, as "artificial" entities, to appear through counsel only). Here, defendants have not only been given two opportunities to file an answer to the Complaint and have failed to do so, but they have also failed to respond to the Order from this Court relating to the calculation of damages, and thus the plaintiff's evidence on damages is undisputed. Given the opportunities afforded defendants and their apparent lack of interest in participating in these proceedings, there seems to be no compelling reason to delay further.

## B. Inquest Damages - Standards

Unlike allegations pertaining to liability, it is well-settled that the burden is on the plaintiff to establish its entitlement to recovery. See United States v. Crichlow, No. 02 CV 6774,

2004 WL 1157406, at *4 (E.D.N.Y. Apr. 9, 2004); Clague v. Bednarski, 105 F.R.D. 552 (E.D.N.Y. 1985). Moreover, the plaintiff must prove damages in an evidentiary proceeding at which the defendant has the opportunity to contest the claimed damages. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d at 158. "'While a default judgment constitutes an admission of liability, the quantum of damages remains to be established [by proof] unless the amount is liquidated or susceptible of mathematical computation.'" Joe Hand Promotions, Inc. v. Hernandez, No. 03 CV 6132, 2004 WL 1488110, at *2 (S.D.N.Y. June 30, 2004) (quoting Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974)).

While "the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not, make the determination through a hearing." Fustok v. Conticommodity Servs., Inc., 122 F.R.D. 151, 156 (S.D.N.Y. 1988) (gathering cases), aff'd, 873 F.2d 38 (2d Cir. 1989). Here, where the plaintiff has filed reasonably detailed affidavits and exhibits pertaining to the damages incurred and where the defendants have failed to respond and present evidence on the issue of damages, the Court can make an informed recommendation regarding damages without an evidentiary hearing.

1) Calculation of Damages

Plaintiff seeks damages in the amount of $334,584.02, representing past due royalties, future lost profits, and reimbursement of the unauthorized checks issued by defendants. (Tractenberg Aff. ¶¶ 2, 3).[12]  At this time, plaintiff has not requested attorneys' fees and costs, but

---

[12]Citations to "Tractenberg Aff." refer to the Affirmation of Craig R. Tractenberg, Esq., submitted in support of ATC's calculation of damages and dated August 22, 2005.

reserves the right to seek these items at a later date. (Id. ¶ 3).

a) Past Due Royalties

Plaintiff seeks as damages royalties advanced to defendants in the amount of $17,797.00, which defendants are required to reimburse to ATC upon termination of the Agreement. (Savitsky Decl., Ex. A § 18.02(1)).

According to the Agreement, ATC is entitled to retain forty percent of the franchisee's gross margin[13] arising from the provision of personnel services. (Id., Ex. A. § 4.03). ATC also retains a forty percent royalty based on all revenues received by the franchisee from the "rendition of services or sales of [other] products." (Id. § 4.04). Obligations related to the payment of royalties and fees begin to accrue on the date that the franchisee commences operation. (Id. § 4.05). As noted in plaintiff's papers, ATC engages in a general practice of advancing royalties to its franchisees. (See Tractenberg Aff. ¶ 4). However, if a franchisee's customers do not pay their bills within 90 days and the franchisee's reserve is insufficient to cover the deficit, the advanced royalties must be repaid to ATC. (Id.)[14]

Based on the Declaration of Mr. Savitsky, the total amount owed by defendants in advanced royalties is $17,797.00. However, neither the Declaration nor its accompanying exhibits explain how this amount was calculated or contain any documentation supporting

---

[13]The gross margin is calculated by subtracting the costs of operation from the net revenues of operation. (Id. ¶ 23; Ex. A § 4.03).

[14]Although there does not appear to be a specific provision in the Agreement requiring the franchisees to repay advanced royalties under these circumstances, the Agreement does require the franchisee to repay all amounts advanced by ATC when due. (Id. § 12.01(2)).

plaintiff's request.[15]  Therefore, the Court respectfully recommends that plaintiff's request for past due royalties be denied, subject to permitting plaintiff to supplement its inquest submissions with sufficient supporting documentation.

      b)   Unauthorized Checks

Plaintiff also alleges that defendants misused certain checks that were intended to expedite payment to ATC employees in emergency situations.  (Savitsky Decl. ¶¶ 11, 20); Tractenberg Aff. ¶ 5).  Instead of using these checks for their intended purposes, defendants allegedly issued checks to themselves in the amount of $24,661.00.  (Tractenberg Aff. ¶ 5).

As with the request for past due royalties, plaintiff neglects to support its inquest papers with any documentation detailing the bases for its request for reimbursement of monies issued to defendants under unauthorized checks.  Thus, the Court respectfully recommends that plaintiff's request for the value of the unauthorized checks be denied, but that plaintiff be afforded the opportunity to submit adequate documentation in support of its request.[16]

---

[15]The Court notes that the file is voluminous and, for the most part, is not accessible on the Electronic Case Filing ("ECF") system.  Nonetheless, while the Court has received and reviewed the entire file, it has located no supporting documentation from which the amount of past due royalties can be confirmed.

[16]The Court finds this especially appropriate in this instance, where plaintiff's estimation of the amount allegedly issued in unauthorized checks has varied over the course of the litigation.  (See Affidavit of Ed Teixeira, dated May 10, 2002 and submitted in opposition to defendants' motion to dismiss the action ("Teixeira 2002 Aff."), ¶ 12) (alleging that defendants issued over $30,000.00 in unauthorized checks using the ATC Quick Pay program)).

### c) Lost Future Royalties

Plaintiff asserts that defendants owe ATC $292,126.02 in lost future profits. (Savitsky Decl. ¶ 24). Under the Agreement, defendants were obligated to operate and generate revenues for the term of the Agreement, which was set to expire on April 2, 2007. (See id., Ex. A §§ 2.03, 3.01, 12.14, 12.23). Plaintiff argues that although the ability to recover an award of lost future royalties or profits has not been addressed by the Second Circuit, the Third Circuit and numerous district courts around the country have supported such an award. (Tractenberg Aff. ¶¶ 7-9). Plaintiff cites numerous cases to support this proposition. See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993); Maaco Enters., Inc. v. Citron, No. 99 CV 5935, 2000 U.S. Dist. LEXIS 6911 (E.D. Pa. 2000); Burger King Corp. v. Barnes, 1 F. Supp. 2d 1367 (S.D. Fla. 1998); McAlpine v. AAMCO Automatic Transmissions, Inc., 461 F. Supp. 1232 (E.D. Mich. 1978).

While plaintiff alleges that courts within the Second Circuit have not "addressed the ability to recover lost future royalties or profits" (Tractenberg Aff. ¶ 7), the Court finds that such recovery has been addressed on numerous occasions. See, e.g., Schonfeld v. Hilliard, 218 F.3d 164, 172-75 (2d Cir. 2000) (holding that plaintiff was not entitled to an award of lost profits for breach of a promise to fund a proposed television channel, where the lost profits were not within the parties' contemplation and the existence and amount of the lost profits could not be ascertained with reasonable certainty); Technology Express, Inc. v. FTF Bus. Sys. Corp., No. 99 CV 11692, 2001 WL 1141871, at *1-2 (S.D.N.Y. May 2, 2001) (issuing a lost profits award following entry of a default judgment); Galloping, Inc. v. QVC, Inc., 27 F. Supp. 2d 466, 468 (S.D.N.Y. 1998) (applying the lost profits analysis where the breached licensing agreement

19

"specifically provided for the payment of profits in the form of royalties"). Indeed, as the few cases cited by the Court illustrate, the issue of lost future profits has been addressed by courts in the Second Circuit both in the inquest context and as related to contractual provisions involving the payment of royalties. However, if plaintiff's general statement is taken to mean that courts in the Second Circuit have not addressed lost future profits in the specific scenario where a franchisor has terminated the franchise agreement and subsequently seeks royalties for the remaining term of the agreement, then plaintiff's statement is accurate. The Court was unable to locate any cases in which the Circuit addressed this specific issue and, as detailed above, plaintiff has cited none.

Under New York law, a plaintiff is entitled to recover lost profits if the plaintiff demonstrates that: 1) the defendant's breach caused the damages; 2) the loss may be proved with reasonable certainty; and 3) the "particular damages were within the contemplation of the parties to the contract at the time it was made." Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 403-04, 624 N.E.2d 1007, 1010-11, 604 N.Y.S.2d 912, 915-16 (1993) (internal citations omitted). A plaintiff may not recover damages that are "merely speculative, possible, or imaginary." Kenford Co., Inc. v. County of Erie, 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235, 502 N.Y.S.2d 131, 132 (1986) (internal citation omitted). While lost profits damages "need not be proven with 'mathematical precision,' they must be 'capable of measurement based upon known reliable factors without undue speculation.'" Schonfeld v. Hilliard, 218 F.3d at 172 (internal citation omitted). Furthermore, "in the case of a new business seeking to recover loss of future profits, a stricter standard is imposed because there is no experience from which lost profits may be estimated with reasonable certainty and other methods of evaluation may be too speculative."

20

Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d at 404, 624 N.E.2d at 1011, 604 N.Y.S.2d at 916

(citing Kenford Co., Inc. v. County of Erie, 67 N.Y.2d at 261, 493 N.E.2d at 235, 502 N.Y.S.2d

at 132); see also Schonfeld v. Hilliard, 218 F.3d at 172 (noting that greater scrutiny is warranted

when dealing with new businesses because there is "no track record upon which to base an

estimate").

      As the Second Circuit has stated, the Court may consider "'the nature, purpose and

particular circumstances of the contract known by the parties'" in determining whether the

damages sought were within the reasonable contemplation of the parties. Travellers Int'l, A.G. v.

Trans World Airlines, Inc., 41 F.3d 1570, 1578 (2d Cir. 1994) (quoting Kenford Co., Inc. v.

County of Erie, 73 N.Y.2d 312, 319, 537 N.E.2d 176, 179, 540 N.Y.S.2d 1, 4 (1989)). Since the

Agreement specifically called for the payment to ATC of a certain sum of the franchisee's gross

margin, the franchisee "'fairly may be supposed to have assumed consciously'" that lost profits

would be an appropriate remedy in certain circumstances under which the franchisor was entitled

to damages. Id.

      Therefore, the instant issue facing the Court is whether defendants' breach caused the lost

profits damages that plaintiff seeks. In this regard, the Court is persuaded by the reasoning in

Postal Instant Press, Inc. v. Sealy, where the court found that defendants' "breach in failing to

timely pay *past* royalties and advertising fees was not a 'proximate' or 'natural and direct' cause

of [the plaintiff's] loss of *future* royalties and advertising fees[,] . . . [as it] was only when

[plaintiff] elected to terminate [the franchise] agreement" that the defendants became unable to

produce revenues as a franchisee. 51 Cal. Rptr. 2d 365, 371 (Cal. Ct. App. 1996).[17] While defendants breached the provisions of the Agreement that collectively called for repayment of advanced royalties and misused ATC's Quick Pay Program, those breaches did not cause the lost royalty damages about which plaintiff complains. It was only when plaintiff, in lieu of remedying the situation in an alternative manner, chose to terminate the Agreement, thereby depriving itself of any future royalties from revenue that defendants would have generated under that Agreement.

Plaintiff contends that Postal Instant Press should not be deemed to bar its recovery of lost future royalties because defendants violated the post-term non-compete covenant and the "damages for that violation are precisely the same as the lost profits claimed by ATC." (Tractenberg Aff. ¶ 10). However, plaintiff does not elucidate, and the Court cannot deduce, why the appropriate remedy for a violation of the non-compete clause would be an award of lost future profits for the duration of the Agreement's original term. This is especially true given the district court's Order, dated November 30, 2001, which enjoined defendants from, among other things, soliciting or contacting ATC's clients or customers and using any of ATC's trade secrets. Accordingly, it is respectfully recommended that plaintiff's claim for lost future profits be

---

[17]Although, as plaintiff points out, Postal Instant Press cites California law in support of its contract principles, the New York lost profits test also includes a causation requirement. This causation requirement, which has proved fatal to claims for lost profits, see, e.g., Spherenomics Global Contact Ctrs. v. vCustomer Corp., 427 F. Supp. 2d 236, 251 (E.D.N.Y. 2006), makes the analysis relevant for our purposes. The Court further notes that many of the cases cited in plaintiff's papers do not involve the factual scenario at issue in this case. See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d at 1161 (detailing a dispute between a franchisor and one of its suppliers); Burger King Corp. v. Barnes, 1 F. Supp. 2d at 1368 (noting that the franchisee notified the franchisor that he would be closing the franchised business and "suspending performance of his obligations under the franchise agreement," thereby abandoning the franchise agreement).

denied.

Even if the Court was to decide that plaintiff was entitled to lost future profits under the circumstances present in this case, plaintiff has failed to submit documentation estimating those lost profits with reasonable certainty. According to Mr. Savitsky, during the three month period that defendants operated the franchise in 1999, ATC, which was entitled to receive 40% of the gross margin, should have received royalties of $8,515.82, while defendants were entitled to receive $12,773.72. (Savitsky Decl. ¶ 23). During the whole of 1999, ATC would have received $56,540.52, an amount equal to $4,711.71 on an average monthly basis.[18] (Id.) Plaintiff then calculated that for the sixty-two months remaining under the Agreement,[19] future damages would amount to $292,126.02 (62 x $4,711.71 = $292,126.02). (Id. ¶ 24).

At the outset, it is unclear why 1999 is chosen as the baseline year for plaintiff's calculations of lost future profits, when defendants operated the franchise for only three months of that year and plaintiff was forced to estimate the gross margin for two of the twelve months. While plaintiff indicates that the accuracy of reporting after that time is questionable due to defendants' "financial defaults" (id. ¶ 23), plaintiff does not detail how the financial defaults themselves, which plaintiff has documented elsewhere in its inquest papers, lead to

---

[18]Plaintiff uses 1999 as the relevant year for its lost profits calculations, calling it the "last full year of reliable operations," and noting that defendants only operated the franchise business for a portion of that year. (Id. ¶ 24). The Court notes, however, that the financial data submitted for January and February 1999 consists solely of plaintiff's estimates, as "some of the expense detail was not available" for those months. (Id. ¶ 23; Ex. B).

[19]It appears that plaintiff made an error in its calculation concerning the number of months remaining under the Agreement. According to plaintiff's papers, the Agreement was terminated effective January 3, 2001 and the term was originally slated to end April 2, 2007. (Id. ¶ 22). Thus, the time remaining under the Agreement is six years and three months, totalling seventy-five months, and not the sixty-two months that plaintiff asserts.

questionable reporting. Moreover, it seems unduly speculative to rely on the profits realized by previous owners of a franchise business in calculating the profit expected to be generated by a new owner of the business. This is especially true where, as here, the royalties generated by the old owners during the calculation period range from $1,904.46 to $8,503.42, while the new owners generated royalties in amounts ranging from $1,991.00 to $3,268.82 during the calculation period.[20] (See id., Ex. B).

## CONCLUSION

In sum, the Court respectfully recommends that plaintiff be denied its request for $17,797.00 in advanced royalties and $24,661.00 as reimbursement of unauthorized checks issued by defendants, pending ATC's submission of sufficient supporting documentation. The Court also respectfully recommends that plaintiff be denied recovery for lost future royalties.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within thirty (30) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(2); Fed.R.Civ.P.6(a), 6(e), 72; Small v. Secretary of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

---

[20]The Court further notes that ATC indicates it would have garnered $5,958.40 in royalties in January 1999, and $6,177.20 in February 1999, the two months for which it estimated the gross margin. (See id., Ex. B).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

**SO ORDERED.**

Dated: Brooklyn, New York
November 22, 2006

_____
Cheryl L. Pollak
United States Magistrate Judge